1

**UNITED STATES DISTRICT COURT**

2

**DISTRICT OF NEVADA**

3  Eric Scheumann,                                        Case No.: 2:21-cv-01405-JAD-BNW

4            Plaintiff

5  v.                                                            **Order Granting Summary Judgment in
   Favor of the Defendant, Denying
   Defendant's Motion to Strike, and Closing
   Case**

6  City of Las Vegas, Las Vegas Fire & Rescue,

7            Defendant                                        [ECF Nos. 40, 43]

8

9          Eric Scheumann brings this employment action against City of Las Vegas Fire & Rescue

10 for events arising from an August 2017 visit to his fire station by guests of a coworker.

11 Scheumann claims that he overheard kissing noises coming from his coworker's dorm, the same

12 coworker showed him and the visiting guests a 15-second pornographic video of "a man's

13 genitalia eclipsing the sun" later that same day, and Scheumann suffered retaliation because he

14 reported the incidents and his superiors' inadequate handling of them.  Fire & Rescue moves for

15 summary judgment, arguing primarily that these events and Scheumann's experiences were not

16 serious enough to support any legal theory.  Because Fire & Rescue has shown that these facts

17 fall short of establishing any of Scheumann's claims, I grant summary judgment in its favor and

18 close this case.

19

20

21

22

23

**Background**

**A.     A coworker's misconduct with guests at the fire station creates an awkward situation for Scheumann.**

Scheumann began working at Fire & Rescue in 2002 and has held the title of fire engineer since February 2013.[1]  In August 2017 he was based out of fire station number nine under the supervision of Captain Ruben Sanchez.[2]  At around noon on August 21, 2017, Scheumann entered the firefighter dormitory area in station nine and discovered his coworker Bill Winder had a visitor with him in his dorm.[3]  Initially, Scheumann thought that the sounds he was hearing—talking and "what sounded like kissing"—were coming from a television.[4]  But he soon realized they weren't and called out to Winder.[5]  He then heard whispering coming from Winder's dorm, Winder responded with something like "okay, you're back," and Scheumann left the dormitory area.[6]  Scheumann described this interaction as "really awkward" but also clarified that it lasted around 30 to 45 seconds, that he didn't see anything, and that he isn't "saying it was like a passionate ravenous scene."[7]  All he heard was "a discussion and some kissing noises, that's it."[8]

---

[1] ECF No. 40-4 at 5 (14:5–8), 6 (27:11–13).  Both parties filed compressed versions of deposition transcripts so that four deposition pages are contained in one ECF page.  When citing to these documents I first cite the ECF pagination, and then I cite the deposition pages and lines in parentheses.

[2] *Id.* at 9 (40: 22–23), 16 (69:15–19).

[3] *Id.* at 10 (44:4–11), 12 (50:3–8).

[4] *Id.* at 12 (52:4–5), 11 (49:14–18).

[5] *Id.* at 12 (50:3–8).

[6] *Id.*; *id.* at 12 (52:18–23).

[7]*Id.* at 12 (52:18–23), 14 (59:7–9, 60:4–8), 13 (54:10–12, 54:2–5).

[8] *Id.* at 13 (54:2–5).

Shortly after Scheumann left the dormitory area, Winder emerged with the visitor, Shannon Rhett, and introduced her to Scheumann.[9]  Scheumann said this interaction was also brief but that both Winder and Rhett were clothed and that he doesn't recall their clothing being in disarray or their buttons undone.[10]  After this introduction, Scheumann went into the kitchen and spoke with Sanchez.[11]  Scheumann told Sanchez that Winder had brought a visitor into the dorms and that, "with everything that's going on," that "is not okay."[12]  According to Scheumann, Sanchez agreed and told Scheumann he would talk to Winder about it.[13]

Winder bringing Rhett into the dorms of the station violated the Fire & Rescue's visitor policy, which provides that "[v]isitors and tours will be permitted in public areas only, unless approved by the Station Captain or supervisor."[14]  Winder had apparently told Sanchez that Rhett and her daughter would be visiting the station for lunch and received his approval,[15] but neither party contends that Rhett was authorized to be in the dorms.  And while Winder was "under the impression that [Rhett] was going to bring her daughter" during this initial visit, she hadn't.[16]  Only Rhett had joined them for lunch and a tour, but she asked if she could return with her daughter later in the evening because her daughter worked for an ambulance company and was interested in learning about becoming a firefighter.[17]

---

[9] *Id.* at 15 (64:1–3).

[10] *Id.* at 15 (64:21–65:11), 16 (67:14–16, 68:1–4).

[11] *Id.* at 16 (69:6–11).

[12] *Id.* at 17 (71:3–6).

[13] *Id.* at 17 (71:3–13).

[14] ECF No. 40-2 at 3.

[15] ECF No. 40-10 at 3 (14:16–19).

[16] ECF No. 40-9 at 4 (24:14–19).

[17] *Id.* at 3 (17:23–18:9).

Rhett did return later that evening with her daughter in tow, and Sanchez was notified about and signed off on the visit.[18]  Rhett and her daughter joined Scheumann, Winder, Sanchez, and the other crewmembers for dinner in the communal kitchen.[19]  During dinner, Rhett's daughter[20] pulled up a video on her phone and Scheumann observed that Winder was laughing at the video.[21]  Winder proceeded to "show the entire table the video."[22]  There was an eclipse that day and the video portrayed "a man's genitalia eclipsing the sun."[23]  Scheumann speculated that the video itself was around 15 seconds long and testified at deposition that he saw it "as it came by as a glance" though long enough to recognize what it was.[24]  According to Scheumann, though, nobody else at the table "seemed openly offended by it."[25]  Scheumann testified that he was offended because the video was shown in the presence of a female firefighter and Rhett's daughter.[26]

---

[18] *Id.* at 12 (140:13–18).

[19] ECF No. 40-4 at 18 (100:8–101:13).

[20] Scheumann repeatedly calls Rhett's daughter a minor in his summary judgment briefing, but he submitted no evidence establishing that this individual—who was apparently employed by an ambulance company at the time—was actually a minor.  He testified only that "she appeared to be a minor to him" but that he didn't know how old she was.  *Id*.

[21] *Id.*

[22] *Id.*

[23] *Id.*

[24] *Id.* at 19 (104:15–25).

[25] *Id.* at 20 (109:8–9).

[26] *Id.* at 32 (189:5–14).

**B.** **Scheumann reports the misconduct to his superiors, and the coworker gets disciplined.**

After dinner, Rhett and her daughter stayed at the station and watched a rookie crewmember go through some drills.[27]  At some point, Winder and Rhett left together but Scheumann didn't see where they had gone at the time.[28]  When he headed the bathroom, he heard Winder and Rhett in the dorms having a "regular conversation."[29]  Scheumann "immediately back[ed] out" and went to go speak with Sanchez.[30]  According to Scheumann, he told Sanchez that Winder and Rhett were "in that dorm right now again" and that Sanchez "need[ed] to handle this right now,"[31] to which Sanchez responded "I'll handle it."[32]  Scheumann then texted his second-level supervisor Battalion Chief Moore about Rhett's presence, telling Moore (among other things) that Winder had "some whore at the station" and that Scheumann had talked with Sanchez twice about it and was "not [l]osing his job if shit [came] of it."[33]

Sanchez then went to find Winder and told him something like "you know better than this" and that they would talk more about it later.[34]  Sanchez also fielded a call from Moore who asked whether a firefighter was having sex with someone at the station, to which Sanchez responded "no" and told Moore everything was being taken care of.[35]  Sanchez met with and

---

[27] *Id.* at 23 (119:8–13).

[28] *Id.* at 24 (126:11–127:12).

[29] *Id.* at 24 (128:11–23).

[30] *Id.*

[31] *Id.* at 25 (132:7–19).

[32] *Id.* at 25 (132:18–21).

[33] ECF No. 40-6 at 2–3.  Scheumann didn't mention the eclipse video during this text conversation.  *See generally id.*

[34] ECF No. 40-10 at 4 (63:4–16).

[35] *Id.* at 5 (80:1–6).

disciplined Winder later that evening with "either coaching or counseling" and had Winder sign a document discussing what he'd done wrong.[36]  Sanchez was later disciplined too but, at least according to Sanchez, only for allowing the eclipse video to be played in the kitchen and not for his handling of Winder's visitor-policy violations.[37]

After these incidents, Sanchez began hearing that Scheumann was gossiping to people that he "had to go over [Sanchez's] head to talk with Chief Moore and do [Sanchez's] job."[38]  Hearing that Sanchez was trying to get ahold of him, Scheumann called Sanchez, who relayed the rumors that he had been hearing and told Scheumann "if you're saying anything, you need to shut the fuck up."[39]  But Scheumann testified at his deposition that Sanchez didn't tell him not to report anything to human resources and that they "never discussed any of that."[40]  Scheumann did, however, believe "that the whole thing was very aggressive and very uncomfortable."[41]  Sanchez spoke with a colleague about, but ultimately didn't pursue, writing Scheumann up for "insubordination" related to this gossip.[42]

Scheumann contacted HR and reported this call with Sanchez.[43]  Scheumann also told the HR representative he spoke with "kind of what had led up to" the call "in a very overview kind

---

[36] ECF No. 40-9 at 10 (84:1–6); ECF No. 40-10 at 5 (77:8–11).  It appears that Winder ultimately was given a higher level of discipline for his conduct on August 21st, though Sanchez testified that he was not involved in that process.  ECF No. 40-10 at 10 (114:6–13), 11 (117:19–21).

[37] ECF No. 40-10 at 11 (117:1–7).

[38] *Id.* at 6 (87: 15–24).  Scheumann heard these rumors as well and was upset by them but testified that they "weren't coming from" him.  ECF No. 40-4 at 30 (180:14–16).

[39] ECF No. 40-4 at 30 (178:13–179:21); *see also* ECF No. 40-10 at 9 (105:5–14).

[40] ECF No. 40-4 at 30 (178:13–179:21).

[41] *Id.*

[42] ECF No. 40-10 at 8 (103:1–104:5).

[43] ECF No. 41-3 at 20 (146:1–148:18).

1 | of way," though he doesn't recall whether he mentioned the eclipse video.[44]  On September 13,

2 | 2017, Senior Deputy Chief Miramontes contacted Scheumann and asked him to prepare a

3 | writeup about the August 21st incidents, which Scheumann provided soon after.[45]  Then, on

4 | September 21, 2017, a whistleblower article ran in the Las Vegas Review Journal (LVRJ)

5 | covering the August 21st incidents[46] and Scheumann's call with Sanchez, though the article

6 | didn't use people's names.[47]

7 | **C.     Scheumann is stripped of certain duties after the reports.**

8 |         At some point after August 21st (though it is not entirely clear when) Fire & Rescue

9 | stripped Scheumann of some apparatus-related duties he had been performing, which involved

10 | acquiring equipment for Fire & Rescue.[48]  He was not paid beyond his normal fire-engineer

11 | salary for performing these duties[49] and, at least at the time, no fulltime apparatus-related role

12 | existed on Fire & Rescue's manning chart.[50]  Scheumann went on workers-compensation leave

13 | in December 2017.[51]  Though he is still employed by Fire & Rescue, he remains out on workers-

14 | compensation leave to this day.[52]  Scheumann doesn't contend that his workers-compensation

15 | leave is related to incidents at issue in this case.[53]

16 | _____

[44] *Id.*

17 | [45] *Id.* at 21 (152:22–153:13).

18 | [46] It appears that the article's authors had access to and quoted from Scheumann's writeup.  *See id.* at 22 (164:7–11).

19 | [47] *Id.* at 22 (164: 13–16).

20 | [48] ECF No. 40-4 at 28 (169:23–25).

    [49] *Id.* at 29 (170:25–171:10).

21 | [50] *Id.* at 29 (170:19–22).

22 | [51] *Id.* at 28, (167:22–24).

    [52] ECF No. 40-1 at ¶¶ 16, 20–21.

23 | [53] *See generally* ECF No. 1; ECF No. 41.  Scheumann does assert in his briefing (without citing to the record) that he "has not been able to return to work because of the hostile work

**D.      Scheumann sues and Fire & Rescue moves for summary judgment.**

        Scheumann alleges five causes of action arising out of this sequence of events: (1) sexual harassment under Title VII and Nevada law; (2) retaliation; (3) sexual harassment under 42 U.S.C. § 1983; (4) intentional and negligent infliction of emotional distress; and (5) negligent hiring, training, supervision, and retention.[54]  Fire & Rescue moves for summary judgment, arguing that most claims lack factual support and several are preempted by state law.[55]  It also contends that Scheumann's hostile-work-environment theory fails because the conduct he complains of wasn't sufficiently severe or pervasive, and that Scheumann hasn't presented sufficient evidence to create a triable issue as to whether he was retaliated against.[56]  Scheumann opposes, arguing primarily that these experiences amount to severe and pervasive sexual conduct and that Fire & Rescue retaliated against him in a variety of ways.[57]

<strong>Discussion</strong>

        Summary judgment is appropriate when the pleadings and admissible evidence "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."[58]  When considering a summary-judgment motion, the court must view all facts and draw all inferences in the light most favorable to the nonmoving party.[59]  When the

---

environment" Fire & Rescue purportedly created.  ECF No. 41 at 22; *see also id.* at 6.  But he doesn't ever explain why he went out on workers-compensation leave or contend that the reason he went out on leave was because of a hostile work environment.  He also does not dispute Fire & Rescue's averment that the leave is "unrelated" to these events.  ECF No. 40-1 at ¶ 20.

[54] ECF No. 1 (complaint).

[55] *See generally* ECF No. 40.

[56] *Id.* at 15–22.

[57] *See generally* ECF No. 41.

[58] *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56(c)).

[59] *Kaiser Cement Corp. v. Fischbach & Moore, Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986).

8

moving party does not bear the burden of proof on the dispositive issue at trial, it is not required to produce evidence to negate the opponent's claim—its burden is merely to point out the evidence showing the absence of a genuine material factual issue.[60]  The movant need only defeat one element of a claim to garner summary judgment on it because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."[61]

**A.  Scheumann's sexual-harassment claims fail.**

Scheumann brings sexual-harassment based hostile-work-environment claims under Title VII, 42 U.S.C. § 1983, and Nevada Revised Statutes (NRS) 613.330.[62]  To prevail on his hostile-work-environment claims, Scheumann must show that, based on the totality of the circumstances, he faced (1) unwelcome verbal or physical conduct (2) because of his sex (3) that was both subjectively and objectively so "severe or pervasive to alter the conditions of [his] employment and create an abusive work environment."[63]  To determine whether the "sufficiently severe or pervasive" standard is met, courts look at factors like "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere

---

[60] *Celotex*, 477 U.S. at 323.

[61] *Id.* at 322.

[62] ECF No. 1 at ¶¶ 91–106, 117–125.  "[T]he employment discrimination standards in § 1983 and NRS § 613.330 are coextensive with those under Title VII," so I analyze these claims together.  *See Doe No. 1 v. Wynn Resorts, Ltd.*, 2023 WL 1782439, at *6 (D. Nev. Feb. 3, 2023) (quoting *Crawford v. Nevada Dep't of Transp.*, 2019 WL 1442178, at *4 n.2 (D. Nev. Mar. 31, 2019)); *see also Davis v. California Dep't of Corr. & Rehab.*, 484 F. App'x 124, 127 n.3 (9th Cir. 2012) (hostile-work-environment analysis under § 1983 mirrors that performed under Title VII); *Pope v. Motel 6*, 114 P.3d 277, 280 (Nev. 2005) ("In light of the similarity between Title VII . . . and Nevada's anti-discrimination statutes, we have previously looked to the federal courts for guidance in discrimination cases.").

[63] *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013); *Manatt v. Bank of Am.*, 339 F.3d 792, 798 (9th Cir. 2003); *Brooks v. City of San Mateo*, 229 F.3d 917, 923 (9th Cir. 2000) (cleaned up).

1  offensive utterance; and whether it unreasonably interferes with an employee's work

2  performance."[64]  Mere offensive utterances, "simple teasing, . . . offhand comments, and isolated

3  incidents (unless extremely serious) will not amount to discriminatory changes in the terms and

4  conditions of employment."[65]  The objective prong of the third element is judged from the

5  perspective of a "reasonable victim."[66]

6          Fire & Rescue argues that "Scheumann's sexual-harassment claim is based solely upon

7  the happenings of a single day" and that relevant incidents weren't "sufficiently severe or

8  pervasive to alter the conditions of Scheumann's employment or create a hostile work

9  environment."[67]  Scheumann counters that the two incidents, one in which he was "exposed to

10 intimate sounds of kissing" and another in which he was "subjected to pornographic images,"[68]

11 were severe and notes that isolated incidents can support a hostile-work-environment claim when

12 they are "extremely severe."[69]  He also contends that these incidents must be viewed in the

13 context of the "hyper-masculine boys-club environment" that he asserts Fire & Rescue

14 "established" and "encouraged."[70]  According to Scheumann, this included employees engaging

15 in "crude or sexual" banter or "locker room talk," being expected to "ignore[e] or cover[] up

16 your co-worker's sexually inappropriate actions" and "pressured into conforming to the hyper-

17

18

19

---

64 *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993).

20 65 *Faragher v. City of Boca Raton*, 524 U.S. 775, 787–88 (1998).

21 66 *Brooks*, 229 F.3d at 924.

67 ECF No. 40 at 16–17 (cleaned up)

22 68 ECF No. 41 at 17.

23 69 *Id.* at 16 (citing *Fried v. Wynn Las Vegas, LLC*, 18 F.4th 643, 648 (9th Cir. 2021)).

70 *Id.* at 12–13.

masculine gender role of 'bro-code' above all," and Fire & Rescue's "history of scandals, many of which were sex scandals."[71]

### 1.    *The August 21st events were neither pervasive nor severe.*

The kissing incident and the eclipse-video incident, considered both individually and cumulatively, aren't severe or pervasive enough to show an actionably abusive work environment.  One involved Scheumann merely hearing kissing sounds (but seeing nothing) and then promptly leaving,[72] and the other involved what Scheumann described as a "glance" at a video on a cell phone that showed a man's testicles eclipsing the sun.[73]  These were brief incidents that occurred on a single day, and they aren't particularly severe.  Neither involved Scheumann being physically threatened or humiliated, and he hasn't produced evidence that either event interfered with performance of his job duties.  Scheumann doesn't cite to any cases in which a court found two isolated incidents with this low level of severity sufficient for a hostile-work-environment claim to survive summary judgment.  And indeed, courts have found that similar incidents occurring on a much more frequent basis were insufficient to create an objectively abusive work environment.[74]

---

[71] *Id.* at 12.

[72] ECF No. 40-4 at 13 (54:2–5) ("I mean, I'm not saying it was like a passionate ravenous scene. I'm saying it was a discussion and some kissing noises, that's it.").

[73] *Id.* at 19 (104:15–105:22).

[74] *See, e.g.*, *Fonseca v. Secor Int'l, Inc.*, 247 F. App'x 53, 55 (9th Cir. 2007) (frequent but brief exposures to pornography on supervisor's computer didn't satisfy "the objective hostility requirement"); *Thompson v. Donahoe*, 961 F. Supp. 2d 1017, 1028–29 (N.D. Cal. 2013) (seeing supervisor hugging and touching other employee "every other day or a couple times a week" not sufficient).

**2.      The record does not support the theory that a hypermasculine culture at Fire & Rescue created a hostile work environment for Scheumann.**

Scheumann cites limited evidence of the hypermasculine environment that he claims Fire & Rescue established and encouraged, and the significance of that evidence is directly undermined by Scheumann's own testimony.  While he alluded to at least two so-called "scandals" during his deposition, it doesn't appear that Scheumann was directly involved with either, and he doesn't explain how they contributed to creating an hostile work environment for him.[75]  As to the crude and sexual banter Scheumann mentions in his response, the record does reference several texts that he received from a coworker and then forwarded to Sanchez that apparently contained distasteful Urban Dictionary definitions of two sex acts.[76]  But Scheumann testified that the texts didn't offend him;[77] and he likewise implied that general "locker room talk," which he participated in, wasn't something that bothered him either.[78]  Scheumann also testified that the so-called "bro code," which involves covering up coworkers' inappropriate conduct, was strongly *discouraged* by Fire & Rescue during the time when the August 21st incidents occurred.[79]  Indeed, it appears that Scheumann's fears of being terminated for covering up Winder's conduct was one of the primary reasons why he reported the visitor-policy violation

---

[75] ECF No. 40-4 at 34 (274:18–21) (captain terminated for having sex with a minor prostitute); ECF No. 41-3 at 29 (222:24–223:10) (deputy chief terminated for sexual misconduct with a subordinate in 2018 after Scheumann left on workers-compensation leave).  These examples of Fire & Rescue employees being terminated for misconduct also tend to undermine Scheumann's overarching argument that Fire & Rescue ignored and supported such misconduct.

[76] ECF No. 40-4 at 31 (183:5–185:3).

[77] *Id.* at 32 (188:20–24).

[78] *Id.* at 26 (137:3–8), 32 (186:1–10, 188:20–24).

[79] ECF No. 41-3 at 10 (91:3–16) (noting that the fire chief "made it very clear" that covering up for coworkers would result in termination; "it was very clear that if you're doing the bro code and covering for your buddy, you're all putting your job on the line").

to Sanchez and discussed it openly with his coworkers,[80] and multiple "high[-]ranking commanding officers" commended him for doing so.[81]

In summary, the two primary incidents at issue happened on a single day and weren't severe enough to create an objectively hostile work environment, and Scheumann testified that he didn't take issue with the crude banter or locker-room talk that occurred among Fire & Rescue employees. Scheumann's argument that Fire & Rescue encouraged a "bro code" that contributed to an objectively hostile work environment is belied by his own testimony that Fire & Rescue actively discouraged employees from covering up their coworkers' misconduct and threatened any who did so with termination. Even considered cumulatively, the conduct Scheumann complains of doesn't rise to a level that was so "severe or pervasive" that it "alter[ed] the conditions of [his] employment and create[d] an abusive work environment,"[82] so I grant summary judgment for Fire & Rescue on his sexual-harassment-based hostile-work-environment claims.[83]

**B.   Scheumann's retaliation claim fails because he suffered no adverse employment action.**

Retaliation claims under 42 U.S.C. § 2000e-3 and NRS 613.340 require the plaintiff to demonstrate that (1) he engaged in a protected activity and (2) his employer took an adverse

---

[80] *See id.*; *see also* ECF No. 40-4 at 29 (70:7–71:13); ECF No. 40-6 at 2.

[81] ECF No. 40-4 at 28 (166:5–20); *see also* ECF No. 40-6 at 5–6.

[82] *Univ. of Tex. Sw. Med. Ctr.*, 570 U.S. at 352; *Manatt*, 339 F.3d at 798; *Brooks*, 229 F.3d at 923 (cleaned up).

[83] In addition to arguing that Scheumann's § 1983 claim fails for the threshold reason that "Scheumann cannot show that he was subjected to sexual harassment in the first place," Fire & Rescue contends that he can't make out a claim for municipal liability under *Monell v. Dep't of Social Servs. of N.Y.*, 436 U.S. 658 (1978). *See* ECF No. 40 at 22–24. Because I find that Scheumann's hostile-work-environment claim fails for other reasons, I need not and thus do not reach the *Monell* arguments that both parties make.

employment action against him (3) because of that protected activity.[84]  In the retaliation context, an adverse employment action is one that "might have dissuaded a reasonable worker from making or supporting a charge of discrimination."[85]  Scheumann contends that he suffered from five types of adverse employment actions: the threatening call from Sanchez, being ostracized by his coworkers, the removal of his apparatus duties, and Fire & Rescue purportedly preventing him from working after the release of the LVRJ article and precluding him from taking advantage of promotional opportunities.[86]  Fire & Rescue argues that these actions don't amount to adverse employment actions or are unsupported by the record.[87]

### 1.    The Sanchez call wasn't an adverse employment action.

Scheumann contends that Sanchez "calling him off-duty and threatening him for his reporting" constitutes an adverse employment action.[88]  The first problem with this argument is that Scheumann's own sworn testimony directly contradicts it.  The record reflects a single arguably "threatening" call with Sanchez, and Scheumann explicitly testified that Sanchez didn't

---

[84] *Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1034–35 (9th Cir. 2006); *see also Davis v. United Parcel Serv., Inc.*, 234 F. App'x 430, 432 (9th Cir. 2007) (citing *Pope*, 114 P.3d at 281–82).

[85] *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006)) (cleaned up).

[86] ECF No. 41 at 21–22.  In his "relevant background facts" section Scheumann also contends that Sanchez "retaliated against Scheumann by specifically requesting that Scheumann be reprimanded for his reporting of the situation to Chief Moore."  ECF No. 41 at 5.  But the deposition excerpts he cites to for this proposition center on the rumors being circulated and the call with Sanchez that those rumors prompted; they don't address Sanchez seeking to discipline Scheumann at all.  *See id.* (citing ECF No. 41-3 at 21 (151:6–11, 152:2–15), 26 (178:1–8)).  Deposition excerpts that Fire & Rescue submitted reveal that Sanchez testified about speaking with a colleague about potentially disciplining Scheumann for gossiping and, in Sanchez's opinion, lying about the August 21st incidents, though apparently nothing ever came of it.  *See* ECF No. 40-10 at 6 (87:15–24), 8 (103:16–22).

[87] ECF No. 40 at 21–22; ECF No. 42 at 12–14.

[88] ECF No. 41 at 21.

threaten him about reporting on that call; according to Scheumann, they "never discussed" it.[89] Sanchez did purportedly tell Scheumann that he needed to "shut the fuck up," but this was in regard to rumors about the August 21st incidents that Sanchez believed Scheumann had been spreading.[90]  The Ninth Circuit has indicated that threats of physical harm or threats of future discharge or loss of benefits could constitute adverse employment actions.[91]  But Scheumann doesn't cite any case holding that a warning to stop spreading rumors—especially one that lacks any mention of reporting, physical harm, or even specific unfavorable consequences if Scheumann failed to heed it—constitutes an adverse employment action.[92]  This threat, if it can even be called one, is just too undefined to qualify as an adverse employment action.[93]

---

[89] ECF No. 41-3 at 26 (179:22–24).

[90] *Id.* at 26 (179:1–8).  Sanchez also testified that this call was about gossip he had been hearing and that he told Scheumann "dude, if you're talking, [] just shut the fuck up and stop talking about what's going on."  ECF No. 40-10 at 9 (105:10–14).

[91] *Ford v. Alfaro*, 785 F.2d 835, 841–42 (9th Cir. 1986) (holding that a threat of physical harm was an adverse employment action); *Acosta v. Zhao Zeng Hong*, 704 F. App'x 661, 665 (9th Cir. 2017) (suggesting that threat of future discharge or loss of benefits could be an adverse employment action).

[92] Sanchez swears at Scheumann during this conversation, but such language appears to have been regularly used among Fire & Rescue employees, including in conversations between superiors and subordinates.  *See, e.g.*, ECF No. ECF No. 40-6 at 2 (Scheumann texting his second-level supervisor Battalion Chief Moore about there being "some whore" at his station and a firefighter "fucking around on duty" to which Moore responded, "Wtf really" and "who in the fuck is duin[sic] that"); *id.* (Scheumann texting Moore that he is "not Losing [his] job if shit comes of it"); ECF No. 40-10 at 5 (80:1–6) (Sanchez testified that Moore called him and asked "is there a guy fucking [a] girl at the station").

[93] The fact that this conversation didn't actually deter Scheumann from filing his HR complaint following this call also tends to undermine Scheumann's contention that Sanchez's warning constitutes an adverse employment action.

### 2.      *The record belies Scheumann's argument that he suffered any other adverse action.*

The other acts that Scheumann puts forth likewise don't amount to adverse employment actions, or they lack evidentiary support.  For example, Scheumann contends that Fire & Rescue instructed him "to not return to work" after the LVRJ article was released but doesn't cite to any evidence to support this assertion.[94]  This court's own review of Scheumann's deposition transcript (performed unaided by any citations) reveals that he did briefly testify about being asked to take time off.[95]  But it is not clear from the deposition exactly when this was, what the reason was for it, whether he actually did take time off, and—if he did—how long he was gone.[96]

Scheumann also argues that Fire & Rescue has prevented him from returning to work and denied him promotional opportunities.[97]  While Scheumann does cite to the record for this assertion, his own cited testimony once again belies his argument rather than supports it.[98]  Indeed, Scheumann testified that he "hasn't been able to take any promotional opportunities" because he hasn't "been at work since December of 2017" when he went out on the workers-compensation leave that he remains on to this day,[99] and he cites no evidence suggesting that

---

[94] ECF No. 41 at 5, 21.

[95] ECF No. 41-3 at 29 (225:1–7).

[96] *Id.*  Scheumann also testified that he left work in December 2017, not in September 2017 after the LVRJ article was published.  *Id.* at 23 (167:22–24).

[97] ECF No. 41 at 21.

[98] *See* ECF No. 41-3 at 23 (167:20–24).

[99] *Id.*; ECF No. 40-1 at ¶¶ 20–21; *see also* ECF No. 40-4 at 34 (277:10–12) ("I was told I couldn't—I couldn't apply because I was off on workers' comp leave.").  Scheumann also testified that he was never told he can't take promotional exams because of his reporting of Winder or Sanchez, ECF No. 41-3 at 23 (167:20–168:7), and that he never was demoted, suspended, or disciplined for reporting them either.  *Id.* at 23 (167:8–19).

Fire & Rescue prevented him from returning.  And in support of his assertion that coworkers ostracized him after LVRJ article was released, Scheumann cites to a deposition page that he didn't submit with his briefing[100] and several in which he discussed the article itself but didn't mention his coworkers' response to it.[101]  Regardless, the Ninth Circuit has held that "ostracism suffered at the hands of coworkers cannot constitute an adverse employment action,"[102] so Scheumann's argument would still fail even if he had cited evidence to support it.[103]

Finally, Scheumann argues that Fire & Rescue's act of stripping him of his apparatus duties constitutes an adverse employment action.[104]  While the parties don't agree about the exact characterization of his apparatus role,[105] Scheumann did testify that his job was "fire engineer" on the manning table, there was no position on the manning table for the apparatus duties he performed (at least at that time), and he was not paid for performing said duties.[106] Courts that have examined similar issues have found that precluding an employee from

---

[100] *See* ECF No. 41 at 21 (citing Scheumann's deposition at 157:11–15).  The excerpts of Scheumann's deposition that Fire & Rescue submitted with its briefing also don't contain this page.  *See* ECF No. 40-4.

[101] ECF No. 41 at 21 (citing Scheumann's deposition transcript at 163–65).

[102] *Brooks*, 229 F.3d at 929.

[103] Scheumann also references that Fire & Rescue spread "rumors" about him, though the only specific example is a rumor that he had resigned from his apparatus role.  *See* ECF No. 41 at 21 (citing ECF No. 41-3 at 24 (170: 3–5)).  But even accepting this testimony as true and construing it in the light most favorable to Scheumann, he hasn't explained how this constitutes an adverse employment action under the law.  *See Brooks*, 229 F.3d at 928–29 (citing *Nunez v. City of Los Angeles*, 147 F.3d 867, 875 (9th Cir.1998) (noting that "badmouthing an employee outside the job reference context do[es] not constitute [an] adverse employment action[]").

[104] ECF No. 41 at 21.

[105] Fire & Rescue contends that Scheumann volunteered to be on an apparatus committee, ECF No. 40-1 at ¶¶ 17–18, while Scheumann says he was "the apparatus project manager."  ECF No. 41-3 at 24 (170:8–9).

[106] ECF No. 41-3 at 24 (170:19–22, 171:7–10, 172:9–11).

performing additional, unpaid duties can be an adverse employment action when there is

evidence that it would negatively impact the employee's advancement opportunities.  In *Knox v.*

*Contra Costa County*, for example, the district court found that the employee presented sufficient

evidence to create a triable issue as to whether her removal from a committee and exclusion from

a training role were adverse employment actions.[107]  The court so found because the employee

had "present[ed] evidence from which a jury could reasonably conclude that [her] stature in the

office, and the associated opportunities for her career advancement, were materially diminished"

by these actions.[108]  The Ninth Circuit has also suggested that removal from an unpaid

committee role might be an adverse employment action if it interferes with an employee's

professional advancement because, in that case, it "might well deter a reasonable employee from

complaining about discrimination."[109]

But Scheumann offers no evidence that the apparatus role did or could impact his

advancement opportunities at Fire & Rescue.  While he certainly seemed to hope that he would

be allowed perform these apparatus duties on a full-time, paid basis, he concedes that such a role

didn't exist at the time.[110]  Assuming he is correct that there is some paid position now for these

duties, the record indicates that Scheumann being out on workers-compensation leave is what

prevents him from applying for that role (as well as other promotional opportunities), not Fire &

---

[107] *Knox v. Contra Costa Cnty.*, 2022 WL 2290686, at *17 (N.D. Cal. June 24, 2022).

[108] *Id.*; *see also Bastidas v. Good Samaritan Hosp. LP*, 2016 WL 1029465, at *8 (N.D. Cal. Mar. 15, 2016) (dismissing retaliation theory based on employee being removed from a particular committee because he hadn't pled facts demonstrating "how his removal . . . would be reasonably likely to deter employees from engaging in protected activity").

[109] *See Thomas v. Cnty. of Riverside*, 763 F.3d 1167, 1169 (9th Cir. 2014) (quoting *Burlington*, 548 U.S. at 69) (First Amendment retaliation case discussing Title VII retaliation standards).

[110] ECF No. 41-3 at 24 (171:25–172:2).

Rescue's 2017 decision to strip him of his apparatus duties.[111]  And he hasn't otherwise explained why—or submitted evidence indicating that—this would have dissuaded a reasonable worker from making or supporting a charge of discrimination.  So Scheumann hasn't demonstrated that there is any triable issue as to whether he suffered an adverse employment action, and his retaliation claim fails, too.

**C.     Scheumann's IIED and NEID claims fail because the conduct he alleges was not outrageous as a matter of law and he didn't suffer severe emotional distress.**

Scheumann's IIED claim fails for reasons similar to those that doom his sexual-harassment and retaliation claims.  To prevail on an IIED claim in Nevada, a plaintiff must prove, among other elements, extreme and outrageous conduct.[112]  This requires showing that the defendant took actions that were not just "inconsiderate and unkind" but rather "outside all possible bounds of decency and . . . regarded as utterly intolerable in a civilized community."[113]  The type of conduct that meets this high burden is just not present in this case, in which the complained-of conduct doesn't even cross the threshold into hostile-work-environment and retaliation territory.  Because there is no indication that Scheumann was subjected to outrageous conduct wholly unacceptable to society, I grant summary judgment for Fire & Rescue on his IIED claim.[114]

---

[111] ECF No. 40-4 at 34 (277:3–12).

[112] *Miller v. Jones*, 970 P.2d 517, 577 (Nev. 1998) (citing *Posadas v. City of Reno*, 851 P.2d 438, 444 (Nev. 1993)).

[113] *See Maduike v. Agency Rent-A-Car*, 953 P.2d 24, 26 (Nev. 1998).

[114] Fire & Rescue presents compelling arguments that Scheumann's common-law claims are preempted by Nevada's employment-discrimination statutes, NRS 613.330 *et seq.*, which it argues provide the sole and exclusive remedy for allegedly unlawful employment practices, and under which Scheumann brings additional claims. ECF No. 40 at 24.  Because I determine the facts of this case vitiate Scheumann's common-law claims, I don't reach Fire & Rescue's preemption arguments.

Scheumann also appears to be advancing a bystander-NIED claim, citing to the Nevada Supreme Court decision *State v. Eaton*,[115] in which the court "recognize[d] a cause of action for serious emotional distress [that] results in physical symptoms caused by apprehending the death or serious injury of a loved one due to the negligence of the defendant."[116]  That such a claim isn't applicable here hardly needs explaining because Scheumann hasn't alleged that he witnessed an accident or other incident involving a family member and that witnessing such an event caused serious emotional distress or physical symptoms.[117]  Of course, Nevada also recognizes "an NIED claim by a direct victim," which "has the same elements as an [IIED] claim, except that the plaintiff need only show that the acts causing distress were committed negligently."[118]  This type of NIED claim also requires "either a physical impact must have occurred or . . . proof of serious emotional distress causing physical injury or illness must be presented."[119]  Scheumann's NIED claim would fail under a direct-victim theory as well because he hasn't shown "extreme and outrageous" conduct or presented evidence of a physical impact or some physical manifestation of severe emotional distress.  So I grant summary judgment in Fire & Rescue's favor on all of Scheumann's emotional distress claims.

---

[115] *See* ECF No. 41 at 26 (citing *State v. Eaton*, 710 P.2d 1370, 1377-78 (Nev. 1985), for the proposition that, for an NIED claim, a plaintiff "must prove that he or she (1) was located near the scene; (2) was emotionally injured by the contemporaneous sensory observance of the accident/incident; and (3) was closely related to the victim").

[116] *Eaton*, 710 P.2d at 1379, *overruled by State ex rel. Dep't of Transp. v. Hill*, 963 P.2d 480 (Nev. 1998), *abrogated by Grotts v. Zahner*, 989 P.2d 415 (Nev. 1999).

[117] *See Grotts v. Zahner*, 989 P.2d 415, 416 (Nev. 1999) (establishing that a bystander bringing an NIED claim must prove "family membership, either by blood or marriage," with the victim).

[118] *Armstrong v. Reynolds*, 22 F.4th 1058, 1081 (9th Cir. 2022) (citing *Abrams v. Sanson*, 458 P.3d 1062, 1070 (Nev. 2020)).

[119] *Id.* (quoting *Barmettler v. Reno Air, Inc.*, 956 P.2d 1382, 1287 (Nev. 1998)); *see also Betsinger v. D.R. Horton, Inc.*, 232 P.3d 433, 436 (Nev. 2010).

**D.   Scheumann hasn't presented evidence of Fire & Rescue's negligent hiring, supervision, training, or retention.**

Scheumann's final claim is for "[n]egligent supervision," "[t]raining," "hiring," and "retention."[120]  Nevada courts recognize two separate torts—one for negligent hiring and another for negligent training, supervision, and retention—but not one that merges them together.[121]  "The tort of negligent hiring imposes a general duty on the employer to conduct a reasonable background check on a potential employee to ensure that the employee is fit for the position."[122]  "An employer breaches this duty when it hires an employee even though the employer knew, or should have known, of that employee's dangerous propensities."[123]  Scheumann hasn't demonstrated that he could prove a negligent-hiring claim because he hasn't shown that Fire & Rescue "failed to conduct a reasonable background check" on Winder, Sanchez, or some other employee.[124]  Indeed, Scheumann doesn't even mention hiring or hiring practices at all in his response to Fire & Rescue's motion, much less submit evidence that Fire & Rescue knew or should have known that any of its employees had dangerous propensities.[125]  So I grant its motion on the negligent-hiring portion of this claim.

The record is similarly devoid of facts to support the remaining negligence-based theories.  In Nevada, the elements of a claim for negligent training, supervision, or retention are:

---

[120] ECF No. 1 at 15.

[121] *Vaughan v. Harrah's Las Vegas, Inc.*, 238 P.3d 863 (Nev. 2008) (table disposition) (separately analyzing a negligent-hiring claim and one for negligent training, supervision, and retention).

[122] *Hall v. SSF, Inc.*, 930 P.2d 94, 98 (Nev. 1996) (quoting *Burnett v. C.B.A. Sec. Serv.*, 820 P.2d 750, 752 (Nev. 1991)).

[123] *Id.* (quoting *Kelly v. Baker Protective Servs., Inc.*, 401 S.E.2d 585, 586 (Ga. Ct. App. 1991)).

[124] *Vinci v. Las Vegas Sands, Inc.*, 984 P.2d 750, 751 (Nev. 1999) (citing *Hall*, 930 P.2d at 98).

[125] *See generally* ECF No. 41.

Case 2:21-cv-01405-JAD-BNW   Document 46   Filed 02/29/24   Page 22 of 26

"(1) a general duty on the employer to use reasonable care in the training, supervision, and retention of employees to ensure that they are fit for their positions, (2) breach, (3) injury, and (4) causation."[126]  Scheumann may be unable to pursue these theories in the absence of viable underlying harassment and retaliation claims,[127]  but they'd still fail for lack of factual support. For example, like with his negligent-hiring theory, Scheumann doesn't mention retention at all in his response and fails to explain why (or produce evidence suggesting that) any decisions not to terminate particular Fire & Rescue employees were negligent or how those decisions caused any of the injuries that he is complaining of.[128]  He doesn't even explicitly say which employees he believes were negligently retained.[129]

As to his negligent-training theory, Scheumann responds to Fire & Rescue's argument that he hasn't identified any specific deficiencies in its training protocols by stating that he "is not responsible for Defendant's training and compliance trainings," "knows when he experiences a hostile work environment that should not occur," and "does not need to remedy Defendant's negligence in order to allege it."[130]  But for this claim to survive, Scheumann does need to submit evidence showing "how the employer violated its duty" because "Nevada law does not

---

[126] *Lambey v. Nev. ex rel. Dep't of Health and Hum. Servs.*, 2008 WL 2704191, at *4 (D. Nev. July 3, 2008) (citing *Hall*, 930 P.2d at 98, for duty and breach elements and *Jespersen v. Harrah's Operating Co.*, 280 F. Supp. 2d 1189, 1195 (D. Nev. 2002), for elements of injury and causation).

[127] *Robichaud v. Cnty. of Clark*, 310 F. App'x 153, 154–55 (9th Cir. 2009) (summary judgment for defendant proper on claim for "negligent supervision resulting in unlawful discrimination" because plaintiff "failed to raise a genuine issue of material fact" on underlying discrimination claim).

[128] *See generally* ECF No. 41.

[129] Both Sanchez and Winder were disciplined for the August 21st incidents and, at least according to Fire & Rescue, neither has been disciplined for any similar policy violations since. *See* ECF No. 41-1 at ¶¶ 28–29.

[130] ECF No. 41 at 27.

22

permit the inference that an employer was negligent in training or supervising simply because the Defendant's employees acted in a discriminatory manner."[131]  Indeed, "the fact that an employee acts wrongfully does not in and of itself give rise to a claim for negligent . . . training or supervision."[132]  Even if, as Scheumann contends, the average Fire & Rescue employee "can't even define sexual harassment and retaliation,"[133] he hasn't submitted any evidence that this purported deficiency is the product of negligent training or the cause of his injuries.[134]  Simply put, there is no evidence of breach or causation to the extent that Scheumann is theorizing that negligent training played a part in Winder's conduct, Sanchez's response to it, or any of the other issues that Scheumann complains of.

Scheumann doesn't really develop his negligent-supervision theory in his briefing,[135] though it can be inferred from some of his statements that he may believe that inadequate supervision contributed to the first incident when he heard Winder and Rhett in the dorms and Scheumann's self-described "glance" at the eclipse video.[136]  In particular, Scheumann argues

---

[131] *Reece v. Republic Servs., Inc.*, 2011 WL 868386, at *11 (D. Nev. Mar. 10, 2011) (citing *Colquhoun v. BHC Montevista Hosp., Inc.*, 2010 WL 2346607, at *3 (D. Nev. June 9, 2010)).

[132] *Id.* (quoting *Colquhoun*, 2010 WL 2346607, at *3)

[133] ECF No. 40-4 at 34 (276:6–8).

[134] The only training-related evidence in the record is the "Non-Discrimination/Anti-Harassment" policy that Fire & Rescue submitted, which notes that harassment and retaliation are prohibited and describes reporting procedures.  ECF No. 40-3.  According to Fire & Rescue, Scheumann also testified that Fire & Rescue provided "'standardized training' for 'general HR classes,'" but it didn't submit the pages of Scheumann's deposition transcript that it cites for this testimony.  *See* ECF No. 40 at 26 (citing Scheumann's deposition transcript at 271:18–273:9); ECF No. 40-4 at 33–34 (Scheumann's deposition transcript, jumping from page 265 to 274).  Scheumann, however, did testify that he was trained in this policy.  *Id.* at 25 (177:16–21).

[135] Scheumann mentions negligent supervision once in his response brief, incorrectly stating that negligent supervision has the same elements as an IIED claim.  ECF No. 41 at 25.  He also asserts that IIED and NIED claims share the same elements as well, but then goes on to list the distinct elements of a bystander-theory based NIED claim.  *Id.* at 25–26.

[136] ECF No. 41 at 26–27.

that Fire & Rescue "never addressed this situation as it was occurring" and that it "could have immediately called Winder, Sanchez, Scheumann, [or] anyone at Station 9, and commanded them to expel all guests, which is easily accomplished."[137]  It isn't clear, however, how inadequate or negligent supervision led to Scheumann hearing what, according to Scheumann, "just sounded like talking" followed by "some kissing sounds."[138]  There is no dispute that Winder wasn't authorized to take Rhett into the dorm area.[139]  But neither party has suggested that bringing visitors into public areas is prohibited, and there isn't any evidence that it was negligent for Sanchez not to have accompanied Winder and Rhett to confirm he didn't stray into private areas or that Sanchez violated some internal policy by failing to do so.[140]

It is likewise unclear how inadequate or negligent supervision led to the eclipse-video incident since it was Rhett's daughter—who was neither a Fire & Rescue employee nor involved[141] in the dorm-room incident—who started showing the video on her phone.[142]  So even assuming Sanchez shouldn't have allowed Rhett to return due to her involvement in Winder's first violation of the visitor policy, this wouldn't have been grounds to preclude Rhett's daughter from joining them for dinner and speaking with one of Scheumann's female coworkers about

---

[137] *Id.* at 26.

[138] ECF No. 40-4 at 11 (49:14–15).

[139] *See* ECF No. 40-8 at 3 (13:2–11) (Fire & Rescue's FRCP 30(b)(6) witness agreed that tours of the "private" areas of a station, which include the dorm rooms, can only be conducted when "authorized by the battalion chief"); *see also* ECF No. 40 at 6–9 (Fire & Rescue's brief describes this incident as a violation of its visitor policy).

[140] Indeed, Fire & Rescue's general conduct policy states only that captains must "be notified when a visitor is in the fire station or work location."  ECF No. 40-2 at 3.

[141] It appears Rhett's daughter wasn't even present at the station when this occurred.  *See* ECF No. 40-8 at 9 (49:4–14).

[142] ECF No. 40-4 at 30 (100:8–101:13).  Scheumann's deposition testimony indicates that Rhett's daughter was initially showing the eclipse video to Winder, who then used her phone to show it to the rest of the people in the kitchen.  *Id.*

24

becoming a firefighter.[143]  Sanchez could have perhaps been more diligent in preventing Winder and Rhett's second dorm-room visit that occurred later that evening and after Scheumann had reported the initial visitor-policy violation.  But Scheumann only heard Winder and Rhett having a "regular conversation" that evening before he "immediately back[ed] out" and left,[144] and there isn't evidence that briefly overhearing this conversation contributed to the injuries Scheumann is alleging.

So there is no evidence to support Scheumann's negligent-retention theory, and his negligent-training and negligent-supervision theories suffer from breach and causation voids.  This leaves no genuine disputes of fact as to Scheumann's negligent training, supervision, and retention claim because he hasn't shown that Fire & Rescue "failed to use reasonable care in the training, supervision, and retention of its employees to ensure their fitness for their respective positions."[145]  So I grant summary judgment in Fire & Rescue's favor on these remaining negligence-based claims, too.

## Conclusion

IT IS THEREFORE ORDERED that Fire & Rescue's motion for summary judgment **[ECF No. 40] is GRANTED.**

---

[143] *See* ECF No. 40-8 at 9 (49:15–20).  To the extent Scheumann is contending that Sanchez could have stopped the video from being shown after he realized what it was, Scheumann testified that he and Sanchez were seated next to each other and got a mere glance of the video at the same time.  ECF No. 40-4 at 20 (106:13–20).  So even if Sanchez had immediately stopped Winder from showing it around, this wouldn't have saved Scheumann from being exposed to it.

[144] *See* ECF No. 40-4 at 36 (129:17–20).

[145] *Vinci*, 984 P.2d at 751 (citing *Hall*, 930 P.2d at 98).

And because I find that the defendant is entitled to summary judgment even when I consider portions of his opposition that Fire & Rescue seeks to strike, IT IS FURTHER ORDERED that Fire & Rescue's motion to strike **[ECF No. 43] is DENIED as MOOT.**

**The Clerk of Court is directed to ENTER JUDGMENT in favor of the defendant and CLOSE THIS CASE.**

_____
U.S. District Judge Jennifer A. Dorsey
February 29, 2024